**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| LAKEESHA FELICIEN, individually and on behalf of her minor child, A.S., <br><br> Plaintiff, <br><br> v. <br><br> ABBOTT LABORATORIES INC., <br><br> Defendant. | CIVIL ACTION <br><br> DEMAND FOR JURY TRIAL <br><br> Case No.: 3:26-cv-879 <br><br><br> June 3, 2026 |

**COMPLAINT**

Plaintiff, LAKEESHA FELICIEN, individually and on behalf of her minor child,

A.S., by and through her undersigned counsel, and in complaining of Defendant, ABBOTT

LABORATORIES, INC., states as follows:

## I.    INTRODUCTION

1.    This is an action to redress the injuries suffered by Plaintiff Lakeesha Felicien and her minor daughter A.S., who has spent the majority of her young life fighting against the harm caused by bovine-milk based (or "cows' milk-based") infant formula manufactured, marketed, and sold by Defendant Abbott Laboratories Inc. Baby A.S. suffered from necrotizing enterocolitis as a result of being fed Defendant's cows' milk-based product. Necrotizing enterocolitis (NEC) is a potentially fatal disease that largely affects premature and low birth-weight babies.  There is a significantly increased rate of NEC among that population of infants who are fed cows' milk-based formula. A.S., a prematurely born, low birth-weight baby, was fed Defendant's cows' milk-based product Similac, and developed NEC as a result.

2.      Plaintiff brings claims against Defendant Abbott Laboratories Inc. arising from Defendant's negligent, willful, and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promotion, marketing, distribution, and labeling of its cows' milk-based formula, Similac.

II.     **JURISDICTION AND VENUE**

3.      This is an action for damages which exceeds the sum of $75,000.00, exclusive of costs, interest, and attorneys' fees.

4.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332, as complete diversity exists between Plaintiff and the Defendant, and the matter in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000.00.

5.      The Court maintains personal jurisdiction over Defendant as it purposely engaged in the business of designing, developing, selecting, testing, assembling, manufacturing, packaging, labeling, preparing, distributing, marketing, supplying, warranting, selling, and introducing into interstate commerce, its cow's milk-based infant formula and fortifier products, including Similac within the State of Connecticut and specifically the District, with a reasonable expectation that the products would be used within this District.

6.      Venue of this action is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district.

7.      Plaintiff anticipates that this action will be treated as a tag-along and transferred by the Judicial Panel on Multidistrict Litigation to MDL No. 3026, *In re Abbott Laboratories, et al., Preterm Infant Nutrition Products Liability Litigation*, for coordinated pretrial proceedings pursuant to 28 U.S.C. § 1407.

8. Plaintiffs file this action in this Court following Defendant's invocation of the doctrine of *forum non conveniens* in Illinois state court. *See Kimberly Deppa, et al. v. Abbott Laboratories, Inc.*, et al., No. 1-24-1795 (cons.). Under Illinois Supreme Court Rule 187, a dismissal of an action under the doctrine of *forum non conveniens* is conditional upon defendant's acceptance of service and waiver of the defense of the statute of limitations if it has run in the other forum.

## III. THE PARTIES

9. Plaintiff resides in Hartford, Connecticut.

10. A.S. is Plaintiff's daughter, born to Plaintiff in 2018.

11. Defendant Abbott Laboratories Inc. ("Defendant" and/or "Abbott") is a corporation incorporated under the laws of Illinois with its principal place of business in Abbott Park, Illinois.

## IV. BACKGROUND

### A. The Science

12. Scientific research has demonstrated strong links between cows' milk-based infant formula and NEC in premature infants.

13. More than thirty years ago, in 1990, a prospective multi-center study on 926 preterm infants found that NEC was 6 to 10 times more common in babies exclusively fed cows' milk-based formula than in babies fed breast milk alone, and three times more common than in those who received formula plus breast milk. Antoine Lucas, et al. *Breast Milk and Neonatal Necrotising Enterocolitis*. 336 LANCET 1519–23 (1990).

14. A study published in 2010 established that when premature babies were fed an exclusive diet of mother's milk, donor milk, and/or human milk fortifier, they were 90 percent less likely to develop surgical NEC. Sandra Sullivan, et al., *An Exclusively Human Milk-Based*

*Diet Is Associated with a Lower Rate of Necrotizing Enterocolitis than a Diet of Human Milk and Bovine Milk-Based Products*, 156 J. OF PEDIATR. 562-67 (2010).

15.     In 2011, the U.S. Surgeon General published a report titled "The Surgeon General's Call to Action to Support Breastfeeding," warning that, "[f]or vulnerable premature infants, formula feeding is associated with higher rates of [NEC]." Arthur I. Eidelman, et al. *Breastfeeding and the Use of Human Milk*. 129 PEDIATRICS e827-41 (2012).

16.     In 2012, the American Academy of Pediatrics issued a policy statement that all premature infants should be fed exclusively a human milk diet because of the risk of NEC associated with the consumption of cows' milk-based formula. The Academy stated that "[t]he potent benefits of human milk are such that all preterm infants should receive human milk. … If the mother's own milk is unavailable … pasteurized donor milk should be used." Margreete Johnston et al., *Breastfeeding and the Use of Human Milk*, 129 PEDIATRICS 827–41 (2012).

17.     A study published in 2013 showed that all 104 premature infants participating in the study receiving exclusively a human-milk based diet exceeded targeted growth standards in height and weight. The authors concluded that "this study provides data showing that infants can achieve and mostly exceed targeted growth standards when receiving an exclusive human milk-based diet." Amy B. Hair, et al., *Human Milk Feeding Supports Adequate Growth in Infants ≤1250 Grams Birth Weight*. 129 BMC RESEARCH NOTES 6-459 (2013). Thus, inadequate growth was shown to be no reason for feeding cows' milk-based formula.

18.     Another study published in 2013 reported, "This is the first randomized trial in [extremely premature] infants of exclusive [human milk] vs. [preterm formula]. The significantly shorter duration of [total parenteral nutrition] and lower rate of surgical NEC support major changes in the strategy to nourish [extremely premature] infants in the NICU." Elizabeth A.

Cristofalo, et al., *Exclusive Human Milk vs. Preterm Formula: Randomized Trial in Extremely Preterm Infants*. 163 J. PEDIATR. 1592-95 (2013).

19.    Another study published in 2014 reported: "It is well established that the risk is increased by the administration of infant formula and decreased by the administration of breast milk." Misty Good, et al., *Evidence Based Feeding Strategies Before and After the Development of Necrotizing Enterocolitis*. 10 EXPERT REV. CLIN. IMMUNOL. 875-84 (2014).

20.    The same study noted, "NEC affects 7-12% of preterm infants weighing less than 1500 grams, and the frequency of disease appears to be either stable or rising in several studies. The typical patient who develops NEC is a premature infant who displays a rapid progression from mild feeding intolerance to systemic sepsis, and up to 30% of infants will die from this disease." Further, "[a] wide variety of feeding practices exist on how to feed the premature infant in the hopes of preventing [NEC]. … The exclusive use of human breast milk is recommended for all premature infants and is associated with a significant decrease in the incidence of NEC." *Id.*

21.    In yet another study published in 2014, scientists reported, "An exclusive human milk diet, devoid of [cows' milk]-containing products was associated with lower mortality and morbidity in [extremely premature] infants without compromising growth and should be considered as an approach to nutritional care of these infants." Steven Abrams, et al. *Greater Mortality and Morbidity in Extremely Preterm Infants Fed a Diet Containing Cow Milk Protein Products*. 9 BREASTFEEDING MEDICINE. 281-86 (2014).

22.    A 2016 study supported previous findings that an exclusive human milk diet in extremely premature infants dramatically decreased the incidence of both medical and surgical NEC. This was the first study to compare rates of NEC after a feeding protocol implementation

at multiple institutions with multiple years of follow-up using an exclusive human milk diet, and was a very large study. The authors concluded, "[T]he use of an exclusive [human milk] diet is associated with significant benefits for extremely premature infants" and, "while evaluating the benefits of using an exclusive [human milk]-based protocol, it appears that there were no feeding-related adverse outcomes." Amy B. Hair, et al., *Beyond Necrotizing Enterocolitis Prevention: Improving Outcomes with an Exclusive Human Milk-Based Diet*. 11 BREASTFEEDING MEDICINE, 70-74 (2016).

23.    A study published in 2017 reported, "[Human milk] has been acknowledged as the best source of nutrition for preterm infants and those at risk for NEC. Two [randomized clinical trials] on preterm infants weighing between 500 and 1250 g at birth compared the effect of bovine milk-based preterm infant formula to [mother or donor milk] on the incidence of NEC. Both trials found that an exclusive [human milk] diet results in a lower incidence of NEC." Jocelyn Shulhan, et al., *Current Knowledge of Necrotizing Enterocolitis in Preterm Infants and the Impact of Different Types of Enteral Nutrition Products*, 8 ADV. NUTR. 0-91 (2017).

24.    Another study published in 2017 reported: "Human milk is the preferred diet for preterm infants as it protects against a multitude of NICU challenges, specifically necrotizing enterocolitis … Preterm infants are susceptible to NEC due to the immaturity of its gastrointestinal and immune systems. An exclusive human milk diet compensates for these immature systems in many ways such as lowering gastric pH, enhancing intestinal motility, decreasing epithelial permeability, and altering the composition of bacterial flora. Ideally, preterm infants should be fed human milk and avoid bovine protein. A diet consisting of human milk-based human milk fortifier is one way to provide the additional nutritional supplements necessary for adequate growth while receiving the protective benefits of a human milk diet."

Diana Maffei et al., *Human Milk is the Feeding Strategy to Prevent Necrotizing Enterocolitis!* 41 SEMIN PERINATAL. 36–40 (2017).

### B.    The Marketing

25.    Notwithstanding strong scientific and medical evidence establishing the serious danger that cows' milk-based formula poses for premature infants, Defendant has long marketed its cows' milk-based products as an equally safe alternative to breast milk, necessary for adequate nutrition, and the choice for the modern, sophisticated mother. Its advertising has at times attempted to portray breastfeeding as an inferior, less sophisticated choice.

26.    Further, Defendant has specifically marketed its cows' milk-based formulas as necessary to the growth and development of premature infants, when in fact, Defendant's products pose a known and substantial risk to these babies.

27.    Defendant's practice of trying to get parents to choose its cows' milk-based formulas over breast milk goes back decades. "Since the late 19th Century, infant formula manufacturers have encouraged mothers to substitute formula for breastmilk." Kenneth D. Rosenberg et al. *Marketing Infant Formula Through Hospitals: The Impact of Commercial Hospital Discharge Packs on Breastfeeding*. 98 AM J PUBLIC HEALTH. 290-95 (2008).

28.    The World Health Organization (WHO) and United Nation's International Children's Emergency Fund (UNICEF) held a meeting more than two decades ago to address the international marketing of breast-milk substitutes. The World Health Director concluded the meeting with the following statement: "In my opinion, the campaign against bottle-feed advertising is unbelievably more important than the fight against smoking advertisement." Naomi Baumslag & Dia L. Michels, *Milk, Money, and Madness: The Culture and Politics of Breastfeeding* 161 (Bergin & Harvey, eds. 1995).

29.      Recognizing the abuse and dangers of the marketing of infant formula, in 1981, the World Health Assembly (WHO's decision-making body) developed the International Code of Marketing of Breast-milk Substitutes ("the Code"), which required companies to acknowledge the superiority of breast milk, and prohibited any advertising or promotion of breast milk substitutes to the general public. The Code specifically prohibited advertising in Article 5, Section 1: "There should be no advertising or other form of promotion to the general public." World Health Organization, The International Code of Marketing of Breast-milk Substitutes: Frequently Asked Questions 16-20 (1981, updated 2017).

30.      Defendant has acknowledged and pretended to endorse the Code. Nonetheless, Defendant has systematically violated the Code's most important provision: "There should be no advertising or other form of promotion to the general public." Advertising of cows' milk-based infant formula has remained pervasive in the United States until today, including Defendant's advertising. One study estimated that formula manufacturers spent $4.48 billion on marketing and promotion in 2014.  Phillip Baker, et al, *Global Trends and Patterns of Commercial Milk-Based Formula Sales: Is an Unprecedented Infant and Young Child Feeding Transition Underway?* 1 PUBLIC HEALTH NUTRITION (2016.)

31.      Defendant has designed and implemented systematic, powerful, and misleading marketing campaigns to deceive parents into believing that: (1) cows' milk-based formula is safe; (2) cows' milk-based formulas are a superior substitute for breastmilk; (3) physicians consider cows' milk-based formula a first choice; (4) the decision to breastfeed or to use cows' milk-based formula is a matter of personal preference merely, with no objective scientific criteria; (5) cows' milk-based formula is necessary for the growth of and is perfectly safe for

premature infants; and (6) cows' milk-based formula is better than breast milk to feed babies to catch up on their growth.

32.    Defendant's across-the-board marketing of its cows' milk-based products to parents of all infants begins early. Defendant sends marketing materials and formula samples to expectant mothers. Defendant routinely offers free cows' milk-based formula and other goodies in baskets given to mothers of both term and preterm infants after they give birth in hospitals and medical clinics. Defendant promotes its products to parents of newborns in medical facilities to create brand loyalty and the appearance of "medical blessing" so that mothers continue to feed their babies formula after they leave the hospital, at great expense to the parents, and substantial profit to Defendant.

33.    One study found that such direct-to-consumer advertising increased request rates of brand choices and the likelihood that physicians would prescribe those brands. R. Stephen Parker & Charles E. Pettijohn, *Ethical Considerations in the Use of Direct-to-Consumer Advertising and Pharmaceutical Promotions: The Impact on Pharmaceutical Sales and Physicians*. 48 J. OF BUSINESS ETHICS 279-290 (2003).

34.    Another study found that exposure to infant feeding advertising has a negative effect on breastfeeding initiation. Xena Grossman, et al., *Exposure to Infant Feeding Advertising During Pregnancy is Associated with Feeding Decisions Postpartum*. Paper presented at American Public Health Association 138th Annual Meeting & Exposition, Washington, DC (Nov. 2010).

35.    In a study on infant feeding advertisements in 87 issues of Parents magazine, a popular parenting magazine, from the years 1971 through 1999, content analysis showed that when the frequency of infant formula advertisements increased, the percentage change in

breastfeeding rates reported the next year generally tended to decrease. Jamie Stang, et al.,

*Health Statements Made in Infant Formula Advertisements in Pregnancy and Early Parenting*

*Magazines: A Content Analysis*. 2 INFANT CHILD ADOLESC NUTR. 16-25 (2010).

36.    The Stang study also found that infant formula company websites, printed

materials, coupons, samples, toll-free infant feeding information lines, and labels may mislead

consumers into purchasing a product that appears equivalent or superior to human milk. This

may induce reliance on a biased source for infant feeding guidance. *Id.*

37.    One author found an advertisement for Defendant's Similac product on the back

cover of the April 2004 issue of American Baby Magazine, reproduced below, that made

repeated comparisons of cows' milk-based formula to breast milk; the ad used the phrase "like

breast milk" six times. Angela B. Hyderkhan, *Mammary Malfunction: A Comparison of*

*Breastfeeding and Bottle Feeding Product Ads With Magazine Article Content*, LSU Master's

Thesis 667 (2005).



38.    In addition to perpetuating the myth that its cows' milk-based products are "like breast milk," Defendant  has also deceived the public into believing that physicians believe Similac products are an ideal choice for babies.

39.    Beginning in 1989, Defendant  began using claims in its advertising that Similac products were the "first choice of more physicians." A plain interpretation of this claim is that physicians believe Similac products are the "first choice" even in preference to breast milk.

40.     Beginning in 1995, Defendant  began a heavy marketing campaign featuring the claim "1st choice of Doctors" on all its infant formula product labels.

41.     A marketing report commissioned by Defendant in March 1998 summarized consumer reactions to several advertising pamphlets for Similac products. The "1st Choice of Doctors" claim scored highest in terms of consumers' likelihood of purchase. The report concluded, "Doctor recommendations and the 'science' behind the formula appeared to drive purchase interest for this concept, as well as the other concepts tested." Use of similar pieces emphasizing the same claim was "highly recommended."

42.     Defendant  released an ad called "The Mother 'Hood" that frames the choice between breast milk and Similac products as a matter of personal preference, a debate which, while heated, is ultimately conducted by parents who simply wish the best for all children. The advertising conceals the fact that the "debate" is a false one, manufactured by companies like Defendant for its own promotional purposes. *See e.g.*, *Similac Commercial The Mother 'Hood*, YOUTUBE, www.youtube.com/watch?v=JUbGHeZCxe4 (last visited May 8, 2026).

43.     Another advertisement by Defendant, titled "The Judgment Stops Here," a documentary-style ad, likewise shows parents coming together, putting aside judgment of each other's choices. The ad is deceptive, however, and violative of the Code, because it puts breast milk and cows' milk-based products on an even playing field, and attempts to chastise any opinion that the question is not merely one of personal choice but of clear scientific evidence. In other words, the ad attempts to insulate Similac products from criticism or judgment, when criticism is wholly appropriate from a scientific standpoint.

44.     Another ad by Defendant for a Similac product states, "[W]hen you are ready to turn to infant formula, but you don't want to compromise, look to Pure Bliss by Similac. It's

modeled after breast milk." This ad implies that being "ready" to "turn to" formula, instead of continuing to breastfeed, is inevitable.  *See e.g.*, Similac US, *90 Years Crafting*, YOUTUBE, www.youtube.com/watch?v=kRaHiTMyYXs (last visited May 8, 2026).

45.    Moreover, Defendant has also attempted to market its cows' milk-based products specifically to premature infants—the very children at highest risk from its use.

46.    In 1978, Defendant began marketing "Similac 24 LBW" specifically for premature infants, claiming that the product was "introduced to meet the special needs of premature infants."

47.    In 1980, Defendant began marketing "Similac Special Care," claiming it was "the first low-birth-weight, premature infant formula with a composition designed to meet fetal accretion rates."

48.    In 1988, Defendant began marketing "Similac Special Care With Iron," claiming it "was the first iron-fortified formula for premature and low-birth-weight infants introduced in the US."

49.    As of 2016, Defendant marketed and sold seven products specifically targeting "Premature/Low birth-Weight Infants": Liquid Protein Fortifier, Similac NeoSure, Similac Human Milk Fortifiers, Similac Special Care 20, Similac Special Care 24, Similac Special Care 24 High Protein, and Similac Special Care 30.

50.    Defendant disseminated online advertisements for Similac products, with the heading "For Babies Born Prematurely." For example, one ad stated, "Your premature baby didn't get her full 9 months in the womb, so her body is working hard to catch up. During her first full year, feed her Similac NeoSure, a nutrient-enriched formula for babies who were born prematurely, and help support her development." The advertisement further claims that the

product is "pediatrician recommended," "#1 brand fed in Hospitals" and "backed by science." The advertisement makes no reference to the specialized need pre-term infants have for human breast milk, and makes no mention of the risk of developing NEC because of ingesting cows' milk-based products.

51.     At all relevant times, Defendant maintained a website, "similac.com," that encouraged parents to choose formula products. The website states, "We promise to offer products that give your child a strong start. Let's find the right option for your little one!" *See Formula Finder—Learn About Formula Options for Your Child?*, SIMILAC, https://www.similac.com/baby-tools-resources/best-milk-formula.html (last visited May 8, 2026). The website includes the prompt, "Was your child born prematurely?" *Id*. If the parent clicks "Yes," the website directs the parent to a page promoting Similac products. *Id*.

52.     There is no mention of the risk of NEC on Defendant's similac.com website. The website expressly and implicitly represents that Defendant's cows' milk-based products are safe for use with premature infants. This promotion is false and misleading.

53.     Another advertisement by Defendant states, "[f]or 100 years, we've been committed to nourishing your baby and supporting you along the way, because babies deserve to be fed, happy, and healthy." The representation to parents that their babies fed Similac will be "fed, happy, and healthy" is directly contradicted by studies that indicate the cows' milk-based formula is dangerous to premature infants. The ad is false and misleading. *See Why Similac?*, SIMILAC, https://www.similac.com/why-similac.html (last visited May 8, 2026).

54.     Defendant's website also features reviews from parents whose premature infants were in the NICU, discussing how wonderful and safe the products are. *See e.g., Similac NeoSure Premature Post-Discharge Infant Formula Powder*, SIMILAC,

https://www.similac.com/products/preemie-formula/neosure-powder/22-8oz-can-4pack.html

(last visited May 8, 2026) ("The NICU started my baby on this formula. I wanted to switch to a

cheaper competitor, but two pediatricians advised to stick with Similac Neosure because my

baby was doing so well on it and doubled his weight!"). There are no reviews discussing NEC. It

is therefore likely that these reviews are curated by Defendant to present a misleading picture of

unanimous endorsement of its products.

55.    CBS News reported that Defendant paid so-called "mommy bloggers" for positive

reviews of Similac products.  Jim Edwards, *Abbott Pays Bloggers For Positive Reviews of Its*

*Similac App*, CBS NEWS (MAR. 11, 2021), https://www.cbsnews.com/news/abbott-pays-

bloggers-for-positive-reviews-of-its-similac-app.

56.    Defendant engages in an aggressive marketing campaign designed to make

parents believe that its cows' milk-based formula are safe and necessary for growth of a

premature infant, they are in fact highly dangerous to premature infants. Cows' milk-based

formula substantially increases the risk of NEC, as explained above.

57.    Defendant's Similac products are commercially available at retail locations

throughout Connecticut and online for delivery to Connecticut.

58.    Despite knowing of the risk of NEC, Defendant did not warn parents of the risk of

NEC associated with its cows'-based formula.

59.    Despite knowing of the risk of NEC, Defendant did not warn doctors, hospitals, or

other healthcare providers of the risk of NEC associated with its cows' milk-based formula.

60.    Despite knowing that its cows' milk-based formula increases the risk of NEC,

Defendant did not provide any instructions or guidance on how to recognize and avoid NEC.

61.    Defendant failed to properly warn parents and healthcare providers that its cows'-based formula can significantly increase the risk that a premature infant will develop NEC; failed to design said products such as to make them safe; and deceived the public, parents, physicians, and other healthcare providers into believing that cows' milk based formula is safe and a necessary alternative to, supplements to, or substitute for human milk.

62.    Despite knowing that its cows' milk-based formula was being fed to premature infants without parents' informed consent, Defendant failed to require or recommend that hospitals inform parents of the significant risk of NEC, or to require that parents' informed consent be obtained prior to feeding it to preterm infants.

C.    **Plaintiff's Use of Defendant's Similac Product**

63.    A.S. was born in Hartford, Connecticut, at 35 weeks gestation.

64.    Shortly after she was born, A.S. was fed Defendant's Similac product.

65.    Shortly thereafter, A.S. was diagnosed with NEC as a result of being fed Defendant's Similac product.

66.    A.S.'s NEC required serious medical interventions and has caused her to suffer long-term medical problems, such as cerebral palsy.

**FIRST CAUSE OF ACTION:**
**CONNECTICUT PRODUCT LIABILITY ACT, CONN. GEN. STAT. §§ 52-572M ET SEQ. (STRICT LIABILITY - DESIGN DEFECT)**

67.    Plaintiff re-states and re-alleges the preceding paragraphs as though fully set forth herein.

68.    Under Connecticut law, "product liability claim . . . may be asserted and shall be in lieu of all other claims against product sellers, including actions of negligence, strict liability and warranty, for harm caused by a product." Conn. Gen. Stat. Ann. § 52-572n(a). "'Product liability claim' shall include, but is not limited to, all actions based on the following theories:

Strict liability in tort; negligence; breach of warranty, express or implied; breach of or failure to discharge a duty to warn or instruct, whether negligent or innocent; misrepresentation or nondisclosure, whether negligent or innocent."

69. Plaintiff alleges that Defendant's cows' milk-based formula is defective in its design because, the formula's risks to premature infants substantially outweigh any utility it provides.

70. Defendant was aware, or should have been aware, that its cows' milk-based formulas are not safe for use in premature infants like A.S., yet it took no steps to prevent their use in such a situation.

71. Defendant's cows' milk-based formulas are defectively designed as alleged above.

72. Defendant's cows' milk-based formulas are unreasonably dangerous as alleged above.

73. Defendant's cows' milk-based formulas' risk of causing NEC is extreme, and substantially deviates from consumers' and Plaintiff's expectations.

74. Defendant failed to develop a human-based milk product that was safer for extremely premature infants and low birth-weight infants like A.S.

75. Defendant has marketed its cows' milk-based formula as safe and beneficial for premature infants like A.S.

76. Defendant has promoted its cows' milk-based formula for extremely premature infants and claims the formula increases the baby's weight and caloric intake, and that the formula is more beneficial than harmful.

77.     Defendant has advanced the false premises to parents, physicians, and other healthcare providers that human milk is not sufficient to meet the nutritional needs of premature infants, and that its cows' milk-based formula is a necessary substitute for or supplement to human milk.

78.     Over the last several years, scientific data and well researched studies have concluded that cows' milk-based products carry unreasonable risks of NEC, which far outweigh the products' benefits.

79.     Scientific research has unequivocally established the dangers of Defendant's cows' milk-based products in causing NEC in premature infants, yet Defendant did nothing to change its product, packaging, guidelines, instructions, or warnings.

80.     Scientific studies show Defendant's cows' milk-based formula should not be sold for use in extremely premature infants, yet Defendant continued to market and sell cows' milk-based formula knowing it would be used by infants like A.S. and knowing it would significantly increase the risk of NEC in premature infants like A.S.

81.     The use of cows' milk-based formula was extremely dangerous and caused an unreasonably high risk that A.S. would develop NEC, yet Defendant provided no detailed instructions or warnings to prevent or alter the way its products were used.

82.     Despite learning that cows' milk-based formula is linked to NEC, Defendant failed to properly collect data from doctors and hospitals in order to develop evidence based strategies, instructions, and warnings to reduce or prevent its products from causing NEC.

83.     Despite learning that cows' milk-based formula is linked to NEC, Defendant took no steps to determine whether and how that link was causal.

84.    Despite knowing that cows' milk-based formula causes NEC in premature infants, Defendant did not conduct any testing, undertake to have others conduct testing and studies, or do any data analysis or research to determine when cows' milk-based formula should not be used or when and how cows' milk-based formula is safe for use in this population.

85.    Despite knowing that cows' milk-based formula causes NEC in premature infants, Defendant did not contact the FDA to inform the agency of this fact.

86.    Neither Plaintiff nor A.S.'s physicians and other healthcare providers were told that cows' milk-based formula could substantially increase the risk that A.S. would be caused to suffer NEC.

87.    Neither Plaintiff nor A.S.'s physicians and other healthcare providers were informed that cows' milk based formula could cause A.S. to develop NEC.

88.    Neither Plaintiff nor A.S.'s physicians and other healthcare providers were told that cows' milk-based formula could and would cause A.S. to suffer long term, devastating maladies, as A.S. has and will.

89.    Neither Plaintiff nor A.S.'s physicians and other healthcare providers were told of the studies showing that cows' milk-based formula was extremely dangerous if fed to A.S. as a premature infant.

90.    Neither Plaintiff nor A.S.'s physicians and other healthcare providers were told of the studies showing that human donor milk was safer for A.S. than cows' milk- based formula.

91.    Neither Plaintiff nor A.S.'s physicians and other healthcare providers were told of the studies showing that an exclusive human milk diet is sufficient to meet all growth and nutritional goals of premature infants.

92. As a result of Defendant's cows' milk-based formulas' defective design, A.S. developed NEC and has continued to suffer long term problems and has needed multiple surgeries, treatments, and interventions, and will need them far into the future.

93. Plaintiff, individually and on behalf of her minor child, A.S., prays for judgment against Defendant, ABBOTT LABORATORIES, INC, for compensatory damages in an amount to be determined at trial; attorneys' fees and costs of suit; and all other relief the court finds just and proper.

**SECOND CAUSE OF ACTION:**
**CONNECTICUT PRODUCT LIABILITY ACT, CONN. GEN. STAT. § 52-572Q (STRICT LIABILITY - FAILURE TO WARN)**

94. Plaintiff re-states and re-alleges the preceding paragraphs as though fully set forth herein.

95. Under Connecticut law, Defendant, as a manufacturer and seller of cows' milk-based formulas, had a duty to warn hospitals, NICUs, doctors, parents, and consumers that its cows' milk-based formulas significantly increase the risk of NEC and long-term adverse medical and developmental consequences and are unsafe or contraindicated for extremely premature infants and low birth-weight babies like A.S.

96. Defendant breached its duty to warn by failing to:

a. warn hospitals, NICUs, doctors, parents, or consumers that its cows' milk-based products significantly increase the risk of NEC and long term adverse medical and developmental consequences in these babies; and are unsafe or contraindicated for extremely premature infants and low birth-weight babies like A.S.;

b. provide a warning or instruction that parents need to be provided an informed choice between the safety of human milk versus the dangers of cows' milk-based products;

c.    provide proper instructions, guidelines, studies, or data on when and how to feed cows' milk-based products to premature infants in order to decrease the risk of NEC;

d.    provide instructions to parents and physicians that cows' milk-based products carry a significant risk of NEC and its long term sequelae;

e.    provide a prominent "black box"-type warning that cows' milk-based products are known to significantly increase the risk of NEC and its sequelae when compared to human milk in premature infants and in low-birth-weight infants;

f.    provide well researched and well-established studies linking cows' milk-based products to NEC and its long term sequelae in premature infants and low birth-weight infants;

g.    cite to, or use, up-to-date medical data on the proper and safe use of cows' milk-based products;

h.    send out "Dear Doctor" letters warning of the risks of NEC, and provide current scientific research and data to better guide hospitals and physicians to better care for the extremely premature infants;

i.    advise physicians and other healthcare providers that cows' milk-based products are not necessary to achieve growth and nutritional targets for premature infants;

j.    advise physicians and other healthcare providers that human milk is superior to cows' milk-based products with regard to the overall health of a premature infant; and/or,

k.    take adequate measures to warn despite knowing that parents were not being warned of the risk of NEC by their physicians.

97.     Plaintiff was never told that cows' milk-based formula could substantially increase the risk that A.S. would be caused to suffer NEC and die.

98.     Plaintiff was never informed that cows' milk-based formula could cause A.S. to develop NEC.

99.     Plaintiff was never told that cows' milk-based formula could and would cause A.S. to suffer long term, devastating maladies, as A.S. has.

100.     Plaintiff was never told of the studies showing that cows' milk-based formula was extremely dangerous if fed to A.S. as a premature infant.

101.     Plaintiff was never told of the studies showing that human donor milk was safer for A.S. than cows' milk-based products.

102.     Plaintiff was never told of the studies showing that an exclusive human milk diet is sufficient to meet all growth and nutritional goals of premature infants.

103.     Defendant's massive marketing campaigns targeted at parents as well as health care providers as detailed in previous paragraphs had the effect of: (1) diminishing the ability of parents to intelligently resist the advice of a healthcare provider to give cows' milk-based products; (2) diminishing parents' desire and understanding of the importance of breastfeeding; (3) diminishing the relationship between physicians and patients relative to nutritional decision-making; (4) making it more difficult for a physician to persuade parents to breastfeed; and (5) making it easier and more economically viable for hospitals to feed premature infants cows' milk-based products instead of donor milk or human milk-derived fortifiers.

104.     As a direct and proximate result of Defendant's negligent failure to warn parents, physicians, and other healthcare providers of the unreasonable danger of its cows' milk-based formulas for premature infants, A.S. suffered severe medical injuries.

105. Plaintiff, individually and on behalf of her minor child, A.S., prays for judgment against Defendant, for compensatory damages in an amount to be determined at trial; attorneys' fees and costs of suit; and all other relief the court finds just and proper.

### THIRD CAUSE OF ACTION:
### CONNECTICUT PRODUCT LIABILITY ACT, CONN. GEN. STAT. §§ 52-572M ET
### SEQ. (NEGLIGENT MISREPRESENTATION)

106. Plaintiff re-states and re-alleges the preceding paragraphs as though fully set forth herein.

107. The allegations contained in previous paragraphs set forth specific representations Defendant has made to consumers, physicians, and other healthcare providers through its advertising and promotional materials (some of which are reproduced above). These representations were made by Defendant on an ongoing and repeated basis.

108. Defendant affirmatively represented to parents, physicians, and other healthcare providers that its cows' milk-based formula was safe, necessary, and equivalent or superior to human milk for premature infants, while concealing the known and substantial risk that such formula causes NEC in that vulnerable population.

109. Defendant misrepresented that its cows' milk-based formulas are safe and beneficial for premature infants like A.S. when it knew or should have known that they are unreasonably dangerous and causes NEC in premature infants and low birth-weight infants like A.S.

110. Defendant misrepresented to parents, physicians, and other healthcare providers that cows' milk-based products are necessary to the growth and nutrition of premature infants, when it knew or should have known that they are not necessary to achieve adequate growth.

111.    Defendant misrepresented that cows' milk-based formula has no serious side effects, when it knew or should have known that it does.

112.    Defendant negligently misrepresented that cows' milk-based products are safe for premature infants like A.S.

113.    Defendant negligently misrepresented that cows' milk-based products are necessary for optimum infant growth.

114.    Defendant negligently misrepresented that cows' milk-based products are similar or equivalent to human milk.

115.    Defendant's misrepresentations proximately caused A.S.'s NEC, and proximately caused A.S.'s long-term medical problems and developmental delays.

116.    Plaintiff, individually and on behalf of her minor child, A.S., prays for judgment against Defendant, for compensatory damages in an amount to be determined at trial; attorneys' fees and costs of suit; and all other relief the court finds just and proper.

## FOURTH CAUSE OF ACTION:
## CONNECTICUT PRODUCT LIABILITY ACT, CONN. GEN. STAT. §§ 52-572M ET
## SEQ. (NEGLIGENCE)

117.    Plaintiff re-states and re-alleges the preceding paragraphs as though fully set forth herein.

118.    Despite knowing that cows' milk-based formula significantly increases the risk of NEC in premature infants, Defendant was careless and negligent because it failed to:

a.    provide proper instructions, guidelines, studies, or data on when and how to feed cows' milk-based formula to premature infants in order to decrease the risk of NEC;

b.    provide instructions to parents and physicians that cows' milk-based formula carries a significant risk of NEC and its long term sequelae;

-24-

c.      provide a prominent "black box"-type warning that cows' milk-based formula is known to significantly increase the risk of NEC and its sequelae when compared to human milk in premature infants and in low birth weight infants;

d.      provide well researched and well established studies linking cows' milk-based products to NEC and its long term sequelae in premature infants and low birth-weight infants;

e.      cite to or use up-to-date medical data on the proper and safe use of cows' milk-based formula;

f.      warn physicians and other healthcare providers of the extreme risk associated with feeding premature infants and low birth weight infants cows' milk-based formula, which, had physicians and other healthcare providers known of it, would have induced physicians and other healthcare providers not to use cows' milk-based formula with A.S.;

g.      send out "Dear Doctor" letters warning of the risks of NEC, and provide current scientific research and data to better guide hospitals and physicians to better care for the extremely premature infants;

h.      advise physicians and other healthcare providers that cows' milk-based formula is not necessary to achieve growth and nutritional targets for premature infants;

i.      advise physicians and other healthcare providers that human milk is superior to cows' milk-based products with regard to the overall health of a premature infant; and/or

j.      take adequate measures to warn despite knowing that parents were not being warned of the risk of NEC by their physicians.

k.      Collect data to determine if its products were safe for premature infants;

l.      Collect data to determine when and how its products could be used safely;

m.      Use the significant peer reviewed research to develop instructions and/or warnings on how and when its cows' milk-based formula should be used in order to protect babies from NEC and its medical sequelae;

n.      Develop evidence-based guidelines or instructions to decrease the risk of its cows' milk-based formula causing NEC;

o.      Provide evidence-based guidelines or instructions to decrease the risk of its cows' milk-based formula causing NEC;

p.      Stop or deter its cows' milk-based formula from being fed to extremely premature infants like A.S.;

q.      Provide evidence-based guidelines or instructions on when or how an extremely premature infant like A.S. should be transitioned to its cows' milk-based formula;

r.      Continuously and vigorously study its cows' milk-based formula to avoid NEC in premature infants;

s.      Market and/or sell its products in a way which would protect premature infants like A.S. from NEC;

t.      Provide proper training or information to health care providers for safe use of its cows' milk-based formula;

u.      Take reasonable precautions to prevent premature infants like A.S. from developing NEC;

v.      Develop a human-milk-based premature infant formula;

w.      Properly or promptly notify the FDA that its cows' milk-based formula significantly increases the risk of NEC in premature infants like A.S.; and/or

x.     Require or recommend that hospitals warn of the risk of causing NEC created by its cows' milk-based formula, despite knowing that NICUs and physicians were not warning of such.

119.   Defendant's negligence proximately caused A.S.'s NEC, and proximately caused A.S.'s long-term medical problems and developmental delays.

120.   Plaintiff, individually and on behalf of her minor child, A.S., prays for judgment against Defendant, for compensatory damages in an amount to be determined at trial; attorneys' fees and costs of suit; and all other relief the court finds just and proper.

**Demand for Jury Trial**

121.   Plaintiff demands a jury trial on all issues so triable.

Dated:  June 3, 2026                                    Respectfully submitted,

PLAINTIFF, LAKEESHA FELICIEN, individually and on behalf of her minor child, A.S.

By:___/s/ Glenn A. Duhl_____
Glenn A. Duhl ct03644
Zangari Cohn Cuthbertson
        Duhl & Grello P.C.
59 Elm Street, Suite 400
New Haven, CT 06510
Tel.: (203) 786-3709
Fax: (203) 782-2766
gduhl@zcclawfirm.com

Fabrice N. Vincent (pro hac vice motion forthcoming)
fvincent@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  415.956.1000
Facsimile:  415.956.1008

Daniel E. Seltz (pro hac vice motion forthcoming)
dseltz@lchb.com
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: (212) 355-9500
Facsimile: (212) 355-9592

Wendy R. Fleishman (pro hac vice motion forthcoming)
CLANCY FLEISHMAN, LLP
40 Wall Street, Suite 2506
New York, New York 10005
(917) 992-4550
WRF@TheCFlaw.com

*Attorneys for Plaintiff*